IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> SALVADOR BUENROSTRO, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS** <br><br> Case No. 2:22-cr-00409-JNP-JCB <br><br> District Judge Jill N. Parrish |

Salvador Buenrostro and his passenger were driving through Utah on their way from California to Ohio when Utah Highway Patrol Trooper Mike Myer pulled them over for obstructed license plates. During the traffic stop, Trooper Myer deployed his K-9, Knox, which alerted to the presence of illegal drugs in their truck. A roadside search of the truck revealed multiple packages of a powered substance (it turned out to be cocaine), so Trooper Myer placed Buenrostro and his passenger under arrest. Buenrostro now argues that Trooper Myer violated the Fourth Amendment by conducting a dog sniff during the traffic stop and that the court should therefore suppress the narcotics evidence as fruit of the poisonous tree.

**FINDINGS OF FACT**

The court bases its findings of fact on Trooper Myer's testimony from the evidentiary hearing and the footage from his body camera (admitted by the parties' stipulation).

One morning in October 2022, Salvador Buenrostro and a close family friend, Erik Martinez Gutierrez, were traveling east through Utah in a maroon Ford F-150 attached to a trailer. As they passed through Tooele County, Trooper Mike Myer from the Utah Highway Patrol noticed

that the truck and trailer license plates were partially obstructed by brackets, violating a Utah law that requires license plates to be legible from a distance of 100 feet during daytime. UTAH CODE ANN. § 41-1a-403(1). He pulled them over to investigate and issue a citation.

Trooper Myer approached the truck on the passenger's side (where Gutierrez was seated) and inquired about the car's registration and insurance information. Gutierrez informed him that the truck was his. While Gutierrez was searching for proof of the insurance, Trooper Myer asked to see Buenrostro's driver's license and invited Buenrostro to his patrol car to talk while he filled out the citation paperwork on his computer.

Buenrostro readily joined Trooper Myer and sat in the passenger seat of the patrol car. While Trooper Myer filled out the citation paperwork, he chatted with Buenrostro about his travel plans with Gutierrez, their jobs back home, and related topics. According to Buenrostro, Gutierrez was moving from California to Ohio, and he was helping transport the last of Gutierrez's belongings; after the drive, he was planning to either return by plane or buy a truck and drive back to California, where he worked as a contractor selling appliances for companies like BestBuy and Lowe's.

About eight minutes into their conversation, Trooper Myer called dispatch to request a records check on Buenrostro. While dispatch was still checking Buenrostro's records, Trooper Myer took Knox from his patrol car and led him to the F-150 to conduct a dog sniff. Within two minutes, Knox began insistently sniffing the front driver's side wheel area. Based on his training with Knox, Trooper Myer knew that such persistent, localized sniffing was an alert behavior and indicated that the dog had detected marijuana, methamphetamine, cocaine, or heroin. Less than a minute after Knox alerted, dispatch got back to Trooper Myer with the results of the records check; Trooper Myer then radioed about Knox's alert. The dog sniff continued for about one more minute.

After returning Knox to the patrol car, Trooper Myer approached Gutierrez and asked for permission to search the truck. When Gutierrez denied permission, Trooper Myer notified him of Knox's alert and told Gutierrez he would search the truck anyway. A backup officer arrived at the scene, and the officers' subsequent roadside search of the vehicle yielded several packages of a substance later identified as cocaine. (The truck was then taken to a Highway Patrol office, where a further search turned up additional packages of controlled substances.) Buenrostro now moves to suppress this evidence as the fruit of a traffic stop extended in a way that violated the Fourth Amendment.

## ANALYSIS

The Fourth Amendment to the U.S. Constitution protects against "unreasonable searches and seizures." U.S. CONST. amend. IV. A traffic stop is a "seizure," so to pass muster under the Fourth Amendment, it must be "reasonable." *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007). A traffic stop is reasonable if it is justified at its inception and otherwise executed in a reasonable manner. *Illinois v. Caballes*, 543 U.S. 405, 408 (2005).

Initially, Buenrostro claims that the traffic stop wasn't justified at the outset. An observed traffic violation, including a violation of a vehicle-equipment regulation, provides valid grounds for a traffic stop (including a pretextual stop). *United States v. Winder*, 557 F.3d 1129, 1135 (10th Cir. 2009); *United States v. Meadows*, 970 F.3d 1338, 1341 (10th Cir. 2020). That means that an officer in Utah is justified in pulling over a vehicle for having license plates partially obstructed by brackets. *See* UTAH CODE ANN. § 41-1a-403(1).

Buenrostro doesn't dispute these well-settled rules; instead, he argues that the bodycam evidence refutes Trooper Myer's testimony that the truck and trailer license plates weren't legible from a distance of 100 feet. The court is not persuaded. Nowhere does the bodycam video clearly

3

capture the license plates, so the video evidence does not undermine—much less refute—Trooper Myer's testimony that he couldn't read the license plates from 100 feet away. The court finds Trooper Myer's testimony credible on this point.

Buenrostro appears to argue in the alternative that even if the truck license plate was obstructed, it was obstructed by the trailer and thus exempted from the 100-foot visibility requirement under a different section of the regulations. Buenrostro is correct that a trailer hitch may lawfully obstruct a vehicle license plate. *See* UTAH CODE ANN. § 41-1a-404(5)(a)(i). So, if Trooper Myer had based his traffic stop on the fact that the trailer was obstructing the truck license plate, Buenrostro's argument may have succeeded. But that's not why Trooper Myer pulled over the F-150. He testified that he couldn't read either the truck's *or the trailer's* license plate because a *bracket* was causing the obstruction. The regulation Buenrostro points to provides no exception for brackets obstructing trailer license plates. Therefore, Buenrostro's alternative argument also fails, and the court concludes that the traffic stop was justified at its inception.

Even if so, Buenrostro argues, Trooper Myer impermissibly extended the scope of the traffic stop by conducting a dog sniff. A traffic stop that is justified at its inception nonetheless violates the Fourth Amendment if the officer unreasonably extends its scope beyond what is reasonably necessary to accomplish the mission of the stop—addressing the traffic violation and attending to officer safety. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). To address the traffic violation and attend to officer safety, the officer may check the driver's license, determine whether any warrants are outstanding against the driver, and inspect the vehicle's registration and proof of insurance. *Id.* at 355.

Conducting a dog sniff isn't necessary to accomplish the mission of a traffic stop because a dog sniff is a criminal investigation unrelated to either traffic violations or officer safety. *Id.*

4

Nevertheless, during traffic stops, an officer isn't prohibited from conducting dog sniffs—or other investigations unrelated to the mission of the traffic stop—as long as these unrelated investigations "do not measurably extend the duration of the stop." *Id.* To lawfully extend the traffic stop to conduct unrelated investigations, the officer must have independent reasonable suspicion of criminal wrongdoing. *Id.*

Thus, to evaluate the constitutionality of a dog sniff during a traffic stop absent independent reasonable suspicion of criminal wrongdoing, the question is whether conducting the dog sniff prolongs the stop. *Id.* at 357. The acceptable duration of the stop is determined by the amount of time the officer needs to complete the traffic stop diligently and expeditiously. *Id.* at 354. So, for example, an officer unlawfully prolongs the stop if he conducts the dog sniff after completing and issuing a citation for the traffic violation. *See Rodriguez*, 575 U.S. 348. That is because the mission of the stop ends when he issues the citation, so any unrelated investigation after that point measurably extends the duration of the stop. Likewise, an officer unlawfully prolongs the stop if before preparing the citation he spends three minutes arranging for backup officers to arrive with a K-9 unit. *See United States v. Cates*, 73 F.4th 795, 807 (10th Cir. 2023) (discussing *United States v. Frazier*, 30 F.4th 1165 (10th Cir. 2022)). In that case it is because every minute that the officer spends trying to arrange for backup, "the citation-related tasks [go] unaddressed." *Frazier*, 30 F.4th at 1173.

But when a dog sniff occurs simultaneously with traffic-related inquiries, it does not add time to the traffic stop and so does not violate the Fourth Amendment. For example, one officer may lawfully conduct a dog sniff while another officer checks the driver's license and vehicle insurance information. *United States v. Baker*, 108 F.4th 1241, 1248 (10th Cir. 2024). Such a traffic

5

stop takes the same amount of time regardless of the dog sniff, so the dog sniff doesn't measurably extend the duration of the stop.

Although the "measurably extend" test requires officers to reasonably diligently pursue the traffic stop's mission, it doesn't require them to use the least intrusive or most efficient means of conducting the traffic stop. *Id.* at 1247–48. For example, an officer may request dispatch to conduct a records check on the driver even if it would be faster for him to check the records himself by using the computer terminal in his patrol car. *United States v. Mayville*, 955 F.3d 825, 831 (10th Cir. 2020). Or an officer may send a quick text message calling for a K-9 unit while he fills out the citation. *Cates*, 73 F.4th at 807–08. Courts are not to second-guess these sorts of logistical decisions. *Mayville*, 95 F.3d at 827.

In effect, for better or for worse, the Fourth Amendment allows an officer to pull a vehicle over for a pretextual traffic violation, verify the driver's license and vehicle insurance information, work on preparing the citation, call dispatch to request a records check, and conduct a dog sniff while dispatch is checking the records. As long as the dog sniff occurs before dispatch returns the results of the records check, the officer has complied with the Fourth Amendment.

This sequence is precisely what Trooper Myer did when he conducted the traffic stop on the F-150 that October morning. He pulled the truck over for an equipment violation (obstructed license plates) and proceeded to conduct traffic-related inquiries like requesting the occupants' identification, inspecting the vehicle's insurance information, and asking the occupants about their travel plans. His conversation with Buenrostro inside his patrol car—alongside which he was preparing the citation—was reasonably related to the mission of the traffic stop because Trooper Myer asked for details about their purported move and travel plans. Toward the end of that conversation, Trooper Myer called dispatch to request a records check on Buenrostro, and while

6

dispatch was checking the records, Trooper Myer ran his dog around the truck and saw alert behaviors. To be sure, it would have been more efficient for Trooper Myer to call dispatch for the records check before conversing with Buenrostro in his patrol car and preparing the citation. But as discussed above, the Fourth Amendment does not require officers to use the most efficient means possible to conduct a traffic stop. *Baker*, 108 F.4th at 1247–48. Accordingly, conducting the dog sniff did not measurably extend the duration of the traffic stop, and the court denies Buenrostro's motion to suppress the evidence uncovered as a result of the dog sniff.

It is worth noting a potentially tricky issue that may arise in dog-sniff cases like this one: what if dispatch returns the results of the records check before the dog sniff is over and before the dog displays any alert behaviors? Here, recall that although the dog sniff continued beyond the point at which dispatch got back to Trooper Myer, Knox had already displayed alert behaviors, so Trooper Myer had reasonable suspicion to continue with the dog sniff and proceed to search the truck. Perhaps that is why Buenrostro did not argue that Trooper Myer unlawfully extended the traffic stop by continuing the dog sniff even after hearing back from dispatch. But if dispatch had gotten back a minute earlier, would Trooper Myer have been required to stop the dog sniff immediately and let Buenrostro and Gutierrez go on their way? That is not what happened here and so the court leaves this question to future cases.

## CONCLUSION AND ORDER

For the reasons above, the court **DENIES** Buenrostro's motion to suppress the evidence discovered during the roadside traffic stop.

Signed October 17, 2024.

BY THE COURT

Jill N. Parrish
United States District Court Judge